**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GERALD T. JOHNSON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 4:25-CV-704 HEA |
| | ) | |
| PATTY FAENGER, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' STATEMENT OF UNCONTROVERTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Gerald T. Johnson and Serenity Memorial Funeral and Cremation Service, LLC ("Plaintiffs"), by and through counsel and pursuant to Fed. R. Civ. P. 56 and L.R. 4.01, states the following uncontroverted material facts in support of their motion for summary judgment. Plaintiffs admit these facts for purposes of summary judgment only and reserve the right to dispute or challenge these facts at trial, if any.

## I. PLAINTIFFS GERALD T. JOHNSON AND SERENITY MEMORIAL FUNERAL AND CREMATION SERVICE LLC

1. Gerald T. Johnson ("Johnson") owns and operates Serenity Memorial Funeral and Cremation Service LLC ("Serenity") and was its funeral director in charge during the relevant 2023 period; he identified himself as Serenity's president at deposition. (Ex. B-1, Johnson Dep. Tr. 7:4-11.)

2. Johnson holds an associate's degree in funeral service education and is licensed as a funeral director and embalmer in Missouri and Illinois. (*Id*. at. 8:18-21.)

3. Serenity is a funeral establishment located at 1905 Union Boulevard, St. Louis, Missouri. (Doc. No. 1, Compl. ¶ 2.)

4. Serenity is a Function A establishment providing embalming services and a Function C establishment providing funeral services. (*Id.*)

5. Plaintiffs filed this civil action on May 15, 2025. Their Complaint asserts federal due process claims in Count I, Missouri constitutional due process claims in Count II, and malicious prosecution against Defendant Patty Faenger[1] in Count III. The pleading demands a jury trial. (*Id.* at ¶ 11.)

## II. DEFENDANT PATTY FAENGER

6. Defendant Patty Faenger's ("Faenger") appointment as Executive Director of the State Board of Embalmers and Funeral Directors (the "Board") began in late 2021, and she served in that position during the relevant 2033 time period. (Ex. A-1, Faenger Dep. Tr. 11:18–12:3.)

7. Faenger's duties included oversight of the Board office and employees, preparation for Board meetings, licensing responsibilities, gathering enforcement information, scheduling, and preparing presentations for the Board. (*Id.* at 12:4–21.)

8. Faenger can request additional investigative work through the Central Investigative Unit ("CIU"). (Ex. A-2, Faenger Dep. Tr. 16:5–22.)

9. Faenger can direct that inspection findings or a findings letter be sent to a licensee. (*Id.* at 17:7–24.)

10. Faenger can request an emergency Board meeting and arrange it if the Board agreed. (*Id.* at 17:25– 18:6.)

[1] The October 27, 2025 Order left Counts I, II, and III pending against Faenger in her individual capacity and dismissed the claims against the Board, Nick McBroom, and the official-capacity defendants. (ECF No. 25, pp. 7–8.)

11. Faenger prepares matters for Board consideration, communicates with Board members, and can make recommendations on some complaints in consultation with Board counsel. (*Id*. at 18:7–17.)

## III. THE WRITTEN NOTICE AND RESPONSE PROCESS USED BY THE BOARD

12. Faenger acknowledged that, in typical cases, the Board provides written findings and requests correction. (Ex. A-3, Faenger Dep. Tr. 42:1–8.)

13. Johnson testified that, before 2023, the Board ordinarily sent him an inspection report and a letter identifying deficiencies and giving instructions for addressing them; he had not previously been required to request those reports. (Ex. B-2, Johnson Dep. Tr. 48:23–49:4; Ex. B-3, Johnson Dep. Tr. 70:13-19; 76:5-12.)

14. Board records confirm that after the April 24, 2022 inspection of Serenity, the Board sent a letter sent to Johnson on August 31, 2022, with a response due November 29, 2022; a second notice was sent to Johnson on December 27, 2022 with a second response due January 15, 2023. (Ex. C, Johnson v. Faenger 002424.)

15. That same cover sheet records that the Board received a response from Johnson on January 11, 2023. (*Id*.)

16. On March 3, 2023, Johnson submitted an email to the Board: "Please find attached the updated embalming log for December 2022." (Ex. K-1, March 7 email, Johnson v. Faenger 002165.)

17. On March 7, 2023, Board staff member Clair Hofmann ("Hofmann") replied to Johnson: "Mr. Johnson, these updates have been received and the violations have been corrected." (*Id*.)

18. Similarly, the Notice Cover Sheet records the violation-correction date for the April 14, 2022 inspection of Serenity as March 3, 2023. (*See* Ex. C.)

## IV. MARCH AND APRIL 2023 INSPECTIONS OF SERENITY

### A. *March 2023 Inspection*

19. An unannounced inspection of Serenity occurred on March 14, 2023. (Ex. D, Defendant's RFA No. 5, p. 2)

20. Faenger personally decided not to send a notice of deficiencies letter to Johnson after the March 14 inspection because she believed more information was needed. (Ex. A-4, Faenger Dep. Tr. 43:10–44:1.)

21. Approximately five weeks after the March 14 inspection, Faenger completed and submitted a referral to the CIU dated April 20, 2023 requesting further inspection and records collection at Serenity. (Ex. A-5, Faenger Dep. Tr. 116:11–23.)

22. Before completing and submitting the referral, Faenger had not given Johnson a notice of any alleged violations. (Ex. A-6, Faenger Dep. Tr. 119:11–14.)

23. Before completing and submitting the referral, Faenger had not interviewed Johnson or any Serenity employee or sought Johnson's explanation of any alleged deficiencies listed in the referral. (*Id.* at 119:4–10.)

24. Johnson testified that during the March 14 inspection he asked Investigator Nick McBroom ("McBroom") to leave a copy of the inspection report so he could promptly address any findings, and that McBroom responded that the Board would be in touch. (Ex. B-3, Johnson Dep. Tr. 70:20–71:3.)

25. Faenger did not recall discussing with McBroom whether Johnson made an oral request for Serenity's inspection reports, does not know why McBroom would have denied such request, and does not know why Johnson had to ask for a copy of the report. (Ex. A-7, Faenger Dep. Tr. 205:16–21.)

B. *April 2023 Inspection*

26. McBroom returned to Serenity on April 26, 2023, to conduct follow-up and obtain records in accordance with the referral submitted by Faenger. (Ex. E, Defendant's Interrog. No. 6; *see also* Ex. A-8, Faenger Dep. Tr. 121:10–22.)

27. McBroom returned to Serenity again on April 27, 2023, to conduct follow-up and obtain additional records. (*Id*.)

28. Faenger was not on site with McBroom during either April inspection; she reviewed photographs and records. (*Id*. at 121:16–22.)

29. Johnson was not present during the April 26 or April 27, 2023 inspections, although he visited the establishment between those inspections. (Ex. B-4, Johnson Dep. Tr. 41:6–15.)

## V. MATERIALS PRESENTED TO THE BOARD AND THE MAY 17 VOTE

A. *May 17, 2023 Board Meeting*

30. After the April inspections, Faenger believed the findings warranted presentation to the Board for a decision and guidance. (*See* Ex. A-4, Faenger Dep. Tr. 43:12–16.)

31. Faenger placed the Serenity matter on the Board's agenda and assembled the materials presented to the Board on May 17, 2023. (Ex. A-9, Faenger Dep. Tr. 126:12–21.)

32. The information assembled by Faenger for presentation to the Board included an inspection summary prepared by Faenger and McBroom's inspection reports and photographs, none of which had been provided to Johnson. (*Id*. at 126:22 – 127:22.)

33. Both Christopher Howard and Taylor Howe recalled that they attended in-person the May 17, 2023, Board meeting at which the filing of an injunction against Serenity was discussed. (Ex. F-1, Howard Dep. Tr. 13:3–16, 14:1–3; Ex. G-1, Howe Dep. Tr. 15:13–18; 16:13–16.)

34. At the May 17 meeting, the Board reviewed materials concerning Serenity, including photographs and documents prepared by Faenger and presented to the Board. (Ex. G-2, Howe Dep. Tr. 31:22–32:4)

35. Faenger acknowledged that the March and April inspection reports had not been provided to Johnson when she included them in the Board materials. (*See* Ex. A-9, Faenger Dep. Tr. 127:19–22.)

36. Christopher Howard, the Board's vice chair during the relevant period, testified that the Board voted to deliver Johnson written notice of the deficiencies and that the vote was unanimous. Howard placed the vote in 2023 but could not recall its precise date. (*See* Ex. F-1, Howard Dep. Tr. 14:17–15:6; Ex. F-2, Howard Dep. Tr. 37:9–25, 38:22–24, 39:14–20.)

37. Howard testified that the responsibility for carrying out the Board's vote to provide written notice to Serenity rested with the Board office—"Patty [Faenger], Claire [Hofmann], or whoever was handling the letters to go out that day." (*Id.* at 38:13–21.)

38. Howard could not confirm that the notice of deficiencies authorized by the Board was ever delivered to Serenity and did not recall receiving a mailing or delivery record. (*Id.* at 37:19–21, 38:1–12.)

39. Faenger admitted that she did not provide Plaintiffs with a written notice of deficiencies following the March and April 2023 inspections before an injunction lawsuit was filed, expressly acknowledging that, after both inspections, "we did not send him a notice of deficiencies." (Ex. A-10, Faenger Dep. Tr. 61:24–62:7; *see also* Ex. A-15, Faenger Dep. Tr. 155:4–10; *see also* Ex. B-2, Johnson Dep. Tr. 48:9–49:4.)

40. Howard attested to the fact that, since his time on the Board, the Board has never sought an injunction against a licensee without first inviting that licensee to a Board meeting for questioning, allowing that licensee to be heard either in-person, telephonically, or by way of a written statement. (Ex. F-3, Howard Dep. Tr. 100:17 – 102:8.)

41. Faenger admitted that, before the injunction filing, Serenity had not been invited to respond to the Board and had not been given the opportunity to be heard before either the Board or the Administrative Hearing Commission. (*See* Ex. A-15, Faenger Dep. Tr. 155:16–23.)

42. Howe recalled that Johnson was not present at the May 17 meeting to answer the Board's questions about Serenity. (Ex. G-3, Howe Dep. Tr. 109:21 – 110:4.)

43. Howard also confirmed that he directed the questions he had about Serenity to Faenger. (Ex. F-4, Howard Dep. Tr. 56:21–57:15.)

44. Howard assumed Faenger's summary provided to the Board was complete. (Ex. F-5, Howard Dep. Tr. 66:12–14.)

45. Howard did not ask Faenger whether favorable facts concerning Serenity existed or what had and had not been verified. (*Id.* at 66:15–22.)

46. Board member Scott Meierhoffer testified that he relied on the facts and documents provided to him by Faenger and did not personally independently verify any allegation against Serenity. (Ex. H-1, Meierhoffer Dep. Tr. 54:1–5; 64:4–20.)

47. Board Chair Taylor Howe testified that he assumed the allegations in the summary drafted by Faenger were accurate based on photographs, but could not speak to the summary's completeness. (Ex. G-4, Howe Dep. Tr. 67:18–68:1–10.)

48. Faenger provided the Board with findings from Serenity's March and April 2023 inspections. After reviewing that information and receiving its legal options from counsel, the Board decided to pursue an injunction against Serenity. (Ex. A-11, Faenger Dep. Tr. 124:22–125:5.)

49. Howard testified that he believed all participating Board members voted in favor of the injunction against Serenity, stating, "I think we all voted yes or yay or whatever we did." (Ex. F-6, Howard Dep. Tr. 105:1–3.)

50. Faenger understood that the requested injunctive relief could stop Serenity from operating. (Ex. A-12, Faenger Dep. Tr. 132:5–12.)

51. Notwithstanding the unanimous notice vote by the Board directing Faenger to provide written notice of deficiencies to Serenity, Faenger acknowledged that she did not send notices of deficiencies to Serenity after the March or April inspections before the injunction was filed. (*See* Ex. A-10, Faenger Dep. Tr. 61:24–62:7, *see also* Ex. A-15, Faenger Dep. Tr. 155:4–10.)

52. When asked what prevented her from providing the inspection reports to Serenity before the injunction filing, Faenger answered that nothing prevented it and that copies would have been provided if Johnson had requested them. (*See* Ex. A-7, Faenger Dep. Tr. 205:6–15.)

53. Johnson testified that neither McBroom nor anyone else told him that the Board was considering emergency closure or that calling Faenger was necessary to prevent an injunction. (*See* Ex. B-3, Johnson Dep. Tr. 71:4–10.)

54. Johnson also testified at the injunction hearing that he had not called Faenger or the Board office to follow up on the request for inspection reports, explaining that he had not needed to do so in the past. (Ex. I-1, Hr'g Tr. 128:2–12.)

## VI. THE INJUNCTION AND FOLLOW-UP INSPECTION

### A. *May 2022 Injunction*

55. On May 22, 2023, the Board filed its petition and consolidated motion for a temporary restraining order and preliminary injunction in Cole County Circuit Court, Case No. 23AC-CC03077. (Ex. J, Board v. Serenity_May 22, 2023 Petition.)

56. The circuit court found that the initial petition was Serenity's first notice from the Board of the alleged violations noted during the March and April 2023 inspections. (Ex. M, Board v. Serenity_Injunction Denial Order, ¶ 10.)

57. Johnson testified that he first learned of the injunction from a newspaper reporter's telephone call on May 23, 2023, and that he received the March and April inspection reports through counsel after the injunction filing. (*See* Ex. B-2, Johnson Dep. Tr. 48:9–22; *see also* Ex. B-3, Johnson Dep. Tr. 71:16–24.)

58. Faenger admitted that Serenity had not been given a deadline to correct any alleged March and April 2023 deficiencies before the injunction filing. (*See* Ex. A-15, Faenger Dep. Tr. 155:11–15.)

59. Faenger did not create a written risk assessment before the injunction filing. (Ex. A-13, Faenger Dep. Tr. 173:2–7.)

60. Faenger did not use a metric, policy, or checklist to define emergency criteria in the assessment. (*Id.* at 173:10–13.)

61. Faenger did not consult a physician, toxicologist, epidemiologist, public-health officer, or infectious-disease expert concerning the assessment discussed at deposition. (*Id.* at 173:14–18.)

62. Faenger did not take liquid samples or test air quality or ventilation. (*Id.* at 173:19–23.)

63. Faenger was unaware of anyone hospitalized, treated, or diagnosed because of Serenity's conditions, and was unaware of a governmental health-agency citation or closure recommendation. (*Id.* at 174:11–17.)

64. Faenger did not quantify exposure probability or severity in terms of severity, duration, or immediacy; she merely reported observations. (*Id.* at 174:18–22.)

B. *May 2022 Inspection*

65. On May 22, 2023, Faenger accompanied three other individuals to a third inspection of Serenity and assisted with photographic information and funeral-home records. (*See* Ex. E, Defendant's Interrog. No. 6.)

66. Johnson was not present during the May 22 inspection because he had traveled that morning to deliver remains to a Chicago funeral home. (*See* Ex. B-4, Johnson Dep. Tr. 41:16–23.)

67. Faenger acknowledged that her first-hand observations gathered from the May 22 inspection did not exist when the decision to file the injunction was made (Ex. A-14, Faenger Dep. Tr. 164:5–23).

68. Faneger also acknowledged that the May 22, 2023 inspection report did not exist when the initial injunction action was filed. (*See* Ex. A-15, Faenger Dep. Tr. 156:8–11.)

## VII. JOHNSON'S REQUEST TO MEET AND SUBMISSIONS CONCERNING CORRECTIONS

69. On May 24, 2023, two days after the injunction filing, Board counsel Samantha Green emailed the March and April 203 inspection materials and photographs to Serenity's attorney, Melvin Raymond ("Attorney Raymond"). (Ex. D, Defendant's RFA No. 31, p. 8; *see also* Ex. A-15, Faenger Dep. 156:1–4.)

70. The following day on May 25, 2023, Johnson emailed Faenger and Hofmann requesting an emergency Board meeting and offering to participate in person, by telephone, or by WebEx. (Ex. K-2, May 25 email; *see also* Ex. D, Defendant's RFA No. 28, p. 7.)

71. On May 26, 2023, Johnson emailed that his attorney had informed him the Board was open to a meeting and that he would check the availability of his advisers. (Ex. K-3, May 26 email, pg. 2.)

72. Johnson testified that, after requesting to meet with the Board, he instead briefly met with Faenger and Board counsel Samantha Green, accompanied by his attorney and an adviser, around May 25 or 26, 2023. He testified that Green ended the meeting after objecting to the adviser's presence, notwithstanding Johnson's authorization for the adviser to attend. (Ex. B-4, Johnson Dep. Tr. 42:22–43:6; Ex. B-5, Johnson Dep. Tr. 73:18–75:1.)

73. On May 29, 2023, Johnson renewed his request and offered to meet by telephone or WebEx, asking that any meeting notice be sent to both him and his attorney. (Ex. K-4, May 29 email, pg. 2.)

74. On May 30, 2023, Johnson again requested an emergency meeting and referenced emails showing procedural changes and building repairs. (Ex. K-5, May 30 email, pg. 2; *see also* Ex. D, Defendant's RFA No. 32, p. 8.)

75. Johnson testified that, after obtaining the allegations, he replaced the morgue floor and porcelain embalming tables, painted the morgue, replaced lighting, and adopted a different embalming-log form, attempting to complete work before the injunction hearing. (Ex. B-6, Johnson Dep. Tr. 78:15–79:18.)

76. Johnson testified that his requests to meet with the Board were intended to show the implemented changes, demonstrate cooperation, and develop an action plan over a reasonable period. He acknowledged that repairs needed to be made, while disputing that emergency closure was warranted. (*Id*. at 79:9–80:11.)

77. Johnson acknowledged that he had fallen behind in maintaining embalming logs in 2023 and could not recall how far behind he was. He also testified that he previously took the log off site to update it and later stopped that practice. (Ex. B-7, Johnson Dep. Tr. 30:24 – 31:17, 55:18–56:21.)

78. On May 31, 2023, Hofmann acknowledged receipt of Johnson's email updates and photographs in an email also addressed to Faenger. (*See* Ex. K-5, May 31 email, pg. 1.)

79. On June 2, 2023 Johnson requested an emergency Board meeting to discuss new policies, record-maintenance procedures, and building repairs. (Ex. K-6, June 2 email, pg. 2; *see also* Ex. D, Defendant's RFA No. 34, p. 8.)

80. Defendant admitted that Johnson's June 2 request for an emergency Board meeting was denied. (Ex. D, Defendant's RFA No. 35, p. 8.)

81. On June 5, 2023, the Board filed its First Amended Verified Petition, and included allegations arising from the May 22 inspection conducted by Faenger and others but excluded any documented changes Johnson made to Serenity. (Ex. L.)

82. The amended petition sought orders restraining Serenity from operating a business or performing services related to care or handling of human bodies, and prohibiting funeral directing and embalming. (*Id.*)

83. The May 2023 inspection report was sent to Attorney Raymond on June 5, 2023. (Ex. D, Defendant's RFA No. 31, p.8; *see also* Ex. A-15, Faenger Dep. Tr. 156:5–7.)

84. On June 6, 2023, Johnson again requested a Board meeting before the injunction hearing to discuss options for moving forward. (Ex. K-7, June 6 email; *see also* Ex. D, Defendant's RFA No. 36, p. 9.)

85. Defendant admitted that Johnson's June 6 request for an emergency Board meeting was denied. (Ex. D, Defendant's RFA No. 37, p. 9.)

86. Howard testified that Faenger had not told him about the June 6 meeting request and that he had not been informed of Johnson's multiple requests to meet with the Board. (Ex. F-7, Howard Dep. 77:4–24.)

## IX. THE INJUNCTION HEARING, ORDER, AND DISMISSAL

87. On June 9, 2023, the Cole County Circuit Court heard evidence on the Board's consolidated motion. (Doc. No. 1, Compl. ¶ 38.)

88. On June 21, 2023, the court denied the Board's consolidated motion for a temporary restraining order and preliminary injunction. (*See* Ex. M.)

89. The court found that the Board had produced no evidence that bodies were untimely or improperly embalmed. (*Id*. at I. B. ¶¶ 14–15.)

90. The court found that the Board's investigator conceded he could identify no non-embalmed bodies stored outside the cooling unit. (*Id.* at ¶ 19.)

91. The court found that the Board had not produced credible evidence that the cooler lacked capacity or that storage in the cooler presented the asserted substantial probability of serious danger. (*Id.* at ¶ 17.)

92. The court found that the investigator testified he did not check the bodies outside the cooling unit to determine whether they were embalmed because "that's not his job." (*Id.* at ¶ 20.)

93. The court found that the investigator testified he observed the transport van for approximately ten minutes. (*Id.* at ¶ 23.)

94. The court found that the investigator did not contact a hospital, morgue, or other entity or agency to determine the dates or times of death of the bodies in the van. (*Id.* at ¶ 24.)

95. The court found insufficient evidence to conclude that bodies were being stored in the transport van and made no finding of improper storage in the van presenting the asserted danger. (*Id.* at ¶¶ 26–27.)

96. The court found evidence supporting allegations concerning identification records and reported cremation dates, while also finding that unidentified bodies were identified after a short period and that Serenity undertook additional employee training. (*Id.* at ¶ 28.)

97. Although it found evidence supporting identification-record and cremation-date allegations, the court found no evidence that the improper recordkeeping presented the asserted substantial probability of serious danger to the public. (*Id.* at ¶¶ 28–29.)

98. The court found that the Board produced evidence of clogged embalming drain sinks. It also found testimony that the sinks required flushing and that the investigator could not state whether he had requested flushing or whether a body had recently been embalmed. (*Id.* at ¶¶ 30–32.)

99. The court found no credible evidence that bodily fluids dripping onto the floor caused danger to the public, noted testimony that this was common during embalming, and found that the stained areas were not open to the public. It found insufficient evidence concerning those conditions to support the asserted substantial probability of serious danger. (*Id.* at ¶¶ 33–36.)

100. The court found that, after receiving the initial petition, Serenity began repairs and changed its record-keeping and body-identification protocols. (*Id.* at ¶¶ 11–12.)

101. The court concluded that the Board had not met its burden of showing a substantial probability of serious danger to the health, safety, or welfare of a Missouri resident, client, or customer. (*Id.* at II. A. ¶ 1.)

A. *Injunction Dismissal*

102. On September 16, 2024, the Board filed a notice voluntarily dismissing its petition without prejudice. (Ex. N, Notice of Voluntary Dismissal without Prejudice.)

103. When asked whether she could recommend that a court action be delayed, narrowed, corrected, or dismissed, Faenger testified that she could express her opinion to the Board but could not make that decision for it. She explained that recommendations of that kind usually came from legal counsel. (*See* Ex. A-2, Faenger Dep. Tr. 18:22–19:15.)

104. Faenger testified that she did not recommend dismissing or narrowing the case after the injunction hearing and that counsel would make recommendations to the Board concerning the direction of the case. (Ex. A-16, Faenger Dep. Tr. 209:5–9.)

105. When asked whether the injunction filing was amended after McBroom's hearing testimony to account for matters he had not verified or regarded as unlawful, Faenger answered, "I don't believe it was," and explained that the Board ultimately withdrew the court proceeding and pursued the Administrative Hearing Commission. (*Id.* at 209:16–210:19.)

106. When asked the reason for dismissal, Faenger testified that the judge had not ruled in the Board's favor and that she remembered the Board voting not to pursue the matter further through the courts and instead pursuing the Administrative Hearing Commission. (*Id.* at 211:3–14.)

107. Faenger testified that the Board reviewed the court's findings, discussed its options with counsel, and decided to dismiss the court case and choose the Administrative Hearing Commission route. (Ex. A-17, Faenger Dep. Tr. 213:4–17.)

## X. PUBLICITY AND EFFECTS ON BUSINESS RELATIONSHIPS

108. Faenger understood that a court filing would be public. (Ex. A-18, Faenger Dep. Tr. 215:11–13.)

109. Johnson testified at the hearing that six or seven families transferred immediately after the newspaper article and described resulting business difficulties. He also testified that twenty-one individuals were employed at Serenity's St. Louis location and that he had furloughed staff, retaining approximately four or five people. (Ex. I-2, Hr'g Tr. 121:9–23, 122:4–14.)

110. Faenger acknowledged that trust is important in the funeral-service business and that the public would have difficulty with information alleging mishandled bodies and biohazards. (Ex. A-19, Faenger Dep. Tr. 222:10–24.)

111. Faenger testified that a St. Louis Post-Dispatch reporter contacted the Board and was directed to the public filings. Her answer did not identify the person who directed the reporter. (Ex. A-20, Faenger Dep. Tr. 224:3–12.)

112. Faenger testified that Board counsel responded to media requests; she described counsel as having her approval to respond appropriately and within legal limits. (*See* Ex. A-18, Faenger Dep. Tr. 216:5–217:6.)

113. Witness Ronda Walker ("Walker") authenticated her June 3, 2026 letter in a declaration under penalty of perjury executed July 31, 2026. (Ex. O, p. 1.)

114. Walker stated from her own experience that she routinely referred residents, families, and staff to Serenity before learning of the newspaper article and proposed injunction, and that the publicity caused her to cease recommending Serenity until the concerns were addressed. (*Id*. at p. 2.)

115. Witness Norman E. Owens, Jr. ("Owens") authenticated his June 2, 2026 letter in a declaration under penalty of perjury executed July 31, 2026. (Ex. P, p. 1.)

116. Owens stated that he had regularly referred individuals and families to Serenity, stopped those referrals after the newspaper article, and sought alternative providers when asked for recommendations. (*Id*. at p. 2.)

117. Witness Darries Rainey ("Rainey") authenticated his June 1, 2026 letter in a declaration under penalty of perjury executed July 22, 2026. (Ex. Q, p. 1.)

118. Rainey stated that Memorial Park Crematory informed him of their decision to sever the business relationship with Plaintiffs due to the newspaper article. (*Id*. at p. 2.)

Date: November 16, 2026

Respectfully submitted,

By: */s/ L. Michelle Lewis*

L. Michelle Lewis, #74335
Siwel Law LLC
P.O. Box 23042
Belleville, Illinois 62223
(730) 274-0136 – Telephone
lmlewis@siwellaw.com

Steven V. Hunter (Pro Hac Vice)
Quarles & Brady LLP
300 North LaSalle Street, Suite 4000
Chicago, IL 60654
(312) 715-5087 – Telephone
(312) 715-5155 – Facsimile
Steven.Hunter@quarles.com

ATTORNEY FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I hereby certify that on November 16, 2026, the foregoing was filed electronically with the Clerk of Court through the Court's CM/ECF system, which sent notice to all counsel of record.

*/s/ L. Michelle Lewis*
ATTORNEY FOR PLAINTIFFS