back at the top of the hour. Right at 11:00 a.m. is fine for me.

**THE WITNESS: Okay.**

COURT REPORTER: Okay. We re off the record.

(BREAK)

COURT REPORTER: Okay, we're back on at 11:00.

MS. LEWIS: Thank you.

MS. LEWIS: (Continuing)

Q. Okay. So, Mr. Howard, thank you for answering my question regarding the written notices and the process for that. So, very specifically, again, referring to the allegations in 2023 that -- that were the considerations for the injunction. The -- and you said the standard board procedure is to receive -- after an inspection, to receive notice -- written notice, sometimes a phone call, but certainly a notice of deficiency mailed via certified mail to -- to that licensee. For the 2023 allegations, do you know whether or not that notice was provided to Mr. Johnson?

**A. We voted for the notice to be delivered to him, yes. As a board, yes. So, as -- as far as me knowing physically if that got delivered to him, I can't answer that question for you.**

Q. Okay. And when was that -- the vote -- the board voted to provide notice of written deficiencies to Mr. -- to Mr. Johnson regarding the allegations in 2023, when was that vote taken?

**A. Would have been during that board meeting.**

Q. Okay. And you said, to the best of your knowledge, you don't know if -- if those written notices were ever delivered?
**A. No, ma'am. I -- I don't -- we don't do the mail system there. The office does all that. The -- I would -- cannot tell you if -- if it was delivered or not, with -- without recalling any records because in any mail that is sent out, they scan it into our board packet, and -- and that way we know when it was mailed and when it was signed for.**
Q. Do you recall receiving something saying when it was --
**A. No, ma'am. I -- I don't -- without going back and trying to find it, and I don't know if those records are still -- they're probably on file there at the state board office.**
Q. Okay, and when the -- when the board made the vote to provide written notice to Serenity, who would have been ultimately responsible for making sure that that happened?
**A. It would have been the board office. It would have been Patty, Claire, or whoever was handling the letters to go out that day.**
Q. Okay. And just to be clear for the record, when you're saying Claire, are you referring to Claire Hoffman?
**A. Yes. Uh-huh. Correct. Sorry. Yes.**
Q. No, it's fine. And do you recall the date of the meeting in which that -- that vote was made?
**A. No, ma'am, I don't recall the date.**
Q. Do you recall the discussion around which the board voted

to send Mr. -- Mr. Johnson a written notice of deficiencies. Do you -- do you recall, like, any of the board discussion that -- that then led the board to make -- to vote to say he needs to be provided a written notice of these deficiencies?

**A. Yes, I can recall some of that. Yes, ma'am. It was recalled that it was a pretty big threat to the public with having an unembalmed bodies. It was a threat that his cooler did not work. It was a threat that there was a van parked with a deceased on a cot in it that had been there for -- nobody knows how long. Nobody had IDs on them. The logs were not upkept. The embalming room was absolutely gross, and that is a pretty big factor that plays into the public being safely taken care of.**

Q. Okay, but it's -- I know you said you can't recall the date, but this -- it sounds like it would have been in that 2023 time frame; correct?

**A. Yes. Yes, correct.**

Q. And was the -- the vote to provide written notice, was that a unanimous vote?

**A. Yes.**

Q. Okay. Prior to May 2023, Mr. Howard, did you know whether Serenity had ever been found to be -- found to be a -- to present a serious danger to the public?

**A. I didn't, no, ma'am.**

Q. Okay. Did you know whether any customer had complained of